IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2009

**STATE OF TENNESSEE v. TYREE ROBINSON**

**Appeal from the Criminal Court for Shelby County**
**No. 01-013118      Chris B. Craft, Judge**

**No. W2008-01001-CCA-R3-CD  - Filed June 16, 2009**

A Shelby County jury convicted the defendant, Tyree Robinson, of first degree premeditated murder, felony murder, and especially aggravated robbery. On his first direct appeal, this court held that the trial court committed reversible error when it failed to instruct the jury, in response to its question, that accomplices could not corroborate each other and then remanded for a new trial. After retrial, the defendant was again convicted of the above three offenses and sentenced to life imprisonment and twenty years, to be served consecutively. On appeal, the defendant argues under an umbrella challenge to the sufficiency of the evidence that: (1) the trial court erred in failing to instruct the jury that two of the witnesses, Ilyas Morris and Mieko Saulsberry, were accomplices as a matter of law, and (2) even assuming those witnesses were not accomplices, their testimony was insufficient to corroborate the testimony of the defendant's accomplices. Upon review, we affirm the judgments of the trial court but remand for entry of amended judgments to reflect the correct offense date.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and
Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Larry Copeland and Samantha Neumann (at trial); Joseph S. Ozment (on appeal), Memphis, Tennessee, for the appellant, Tyree Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell and Amy Weirich, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the April 2001 murder of the victim, O'Neil Cornish, for which the defendant was indicted and convicted of first degree premeditated murder, felony murder, and especially aggravated robbery. On direct appeal, this court reversed the judgments of the trial court and remanded for a new trial, concluding that the trial court erred in failing to instruct the jury, in response to its question, that accomplices cannot corroborate each other. State v. Robinson, 239 S.W.3d 211 (Tenn. Crim. App. 2006). The second trial was conducted from January 28 to February 1, 2008.

## State's Proof

Sergeant Eric Freeman with the Memphis Police Department testified that he was working as a crime scene officer on April 10, 2001 and responded to a "D O A unknown" call near Shepherds Tree Street and Kilarney Avenue. The scene was a dead-end street that had been cleared for development, but was being used as a dumping ground. At the scene, he found a young black male with a gunshot wound lying in the street and a large amount of blood around the body. He also found several .380 shell casings, a bullet fragment, loose tobacco, a cigar tip, blood-stained tissue paper, a sales receipt, a troweling or cutting wheel, and a Waffle House identification card with the name Jennifer. Sergeant Freeman noted that the victim had twenty-five dollars in his sock.

Percy Alexander, retired battalion chief with the Memphis Fire Department, testified that he was driving around searching for his lost dog on the morning of April 10, 2001, in the area of Shepherds Tree Street and Kilarney Avenue. As he looked into a cove, Alexander saw the motionless victim lying on the ground, got out of his car, and approached the victim. He saw a stream of blood and noticed that the victim had a wound to his head and was deceased. Alexander returned to his car, called 911, and waited for the police to arrive.

Seku Teamer, the best friend of the victim, testified that he and the victim were at Wing City, a nightclub, in the early morning hours of April 10, 2001, when the victim received a phone call. The voice on the phone appeared to be that of a male. The two left the nightclub approximately fifteen minutes after the victim received the phone call. The victim dropped Teamer off at the home they shared, saying he was going to the Loft Apartments "to have intercourse with Takisha Brown and he was going to join in with [the defendant]." The victim then drove away in his Blazer with relatively new, flashy rims.

Ilyas Morris, also known as "Big E," testified that in April 2001 he lived with the defendant, Cortney Perry,[1] Takisha Brown, Terrance Scott, and Willie Rosser at the Loft Apartments. On April 10, 2001, Morris was trying to sleep downstairs in the apartment when he heard the defendant, Brown, and Perry talking upstairs, but he could not recall the nature of their conversation. He then heard the three leave the apartment.

---

[1] Cortney Perry's brother, Corey Perry, was mentioned during trial but did not testify. Hereinafter, "Perry" will refer to Cortney Perry.

Morris said that he subsequently was awakened by Mieko Saulsberry, one of the defendant's friends, who wanted Morris to go with him to meet the defendant at Club on the Green, another apartment complex. The two drove Morris' van to Club on the Green, but the defendant was not there so they waited. As they were getting ready to leave, a green truck with custom rims pulled in flashing its lights. Morris saw that the defendant was driving the truck and that Brown and Perry were with him. Morris had never seen the truck before and knew it did not belong to the defendant. Everyone got out of the truck, and the defendant removed all of his clothes except his underwear. Morris looked inside the truck and saw "[a] lot" of blood on the driver's seat. He also saw a VCR on the passenger's side, which he took and put in his van.

Morris testified that they all left in his van and went back to the Loft Apartments to look for a floor jack to remove the rims from the green truck, but they were unable to find one. The defendant then directed Morris to where the victim's body was located to make sure the victim was dead. When they got to the body, the defendant told Perry to shoot the victim again. Perry grabbed a gun off the floorboard of Morris' van, got out, and shot the victim two to four times. Morris said the gun did not belong to him and described it as a small silver .380. There was also another gun on the floorboard – a larger .380 with the safety missing, which Morris knew belonged to the defendant. After Perry shot the victim, the group returned to the Loft Apartments to look again for a floor jack.

Morris recalled that he drove the group to a gas station, and they purchased a gallon of gas in a Jungle Juice container. They drove back to the victim's truck at Club on the Green, and Saulsberry and Perry threw the gas on the truck and burned it. Saulsberry received second degree burns in the process. After burning the truck, everyone got back into the van and returned to the Loft Apartments. Morris said that approximately a week later, the police questioned him, the defendant, and Perry about Saulsberry's burns. Morris told the police that he did not know anything about the burns. Morris said he met the defendant and Perry afterwards to dispose of the guns and drove them to the defendant's mother's house where the defendant retrieved the guns. Morris then drove the defendant and Perry to Coro Lake where they threw the guns into the water. Morris was later arrested and told the police everything that had happened and helped them locate the guns. Morris said he pled guilty to accessory after the fact due to his involvement.

On cross-examination, Morris acknowledged that when he was arrested, he was informed that he could be charged with murder. He admitted that in his statement to police approximately two weeks after the murder, he said it was the defendant, not Saulsberry, who awakened him and told him to go to Club on the Green. He testified that he could not remember who it was that actually woke him that night. Morris acknowledged that he overheard the defendant, Brown, and Perry talking about robbing the victim, but said he did not think the defendant was serious. He admitted that by picking the defendant up afterwards, he was, in effect, acting as the getaway driver. On redirect, Morris said that he was the only one in the household who had a vehicle, and he drove where the defendant told him.

Mieko Saulsberry testified that he, Cortney Perry, Ilyas Morris, and others lived with the defendant at the Loft Apartments in April 2001. At the time, the defendant had an entertainment company called "In Town Entertainment," and Saulsberry worked security and played instruments for him. During the early morning hours of April 10, 2001, Saulsberry was asleep in the defendant's room when the defendant woke him and told him to get in Morris' van. Morris, Perry, and Brown were already in the van, and they drove to a gas station and purchased gas in a milk or Jungle Juice jug. Saulsberry stated that he asked the defendant what was happening, and the defendant told him the less he knew the better. They then drove to the location of the victim's body.

Saulsberry said that when they arrived at the victim's body, the defendant told Perry to get out of the van. Perry got out and shot the victim twice. They then drove to Club on the Green Apartments and proceeded to the back of the complex where a truck with "high profile . . . chrome rims" was parked. The defendant, Perry, and Brown "wip[ed] down the truck," tried to remove the rims and radio, and poured gasoline on the truck. Because they had spilled gasoline on themselves, the defendant asked Saulsberry to light the fire, which he did. The truck exploded, and Saulsberry was severely burned. Saulsberry's girlfriend eventually took him to the hospital where he was questioned by the police and told them a fabricated story. However, he later told the police the truth and pled guilty to the offense of burning personal property.

Takisha Brown testified that she was dating Cortney Perry's brother, Corey, at the time of the murder. At that time, Cortney, Corey, Mieko Saulsberry, and the defendant lived together at the Loft Apartments, and Ilyas Morris stayed there occasionally. Brown said that she sometimes stayed there with Corey but actually lived with her mother. On the evening of April 9 or 10, Brown returned to the Loft Apartments after seeing a movie with a friend and recalled that the defendant, Cortney, Corey, Morris, and possibly Saulsberry were there when she arrived. The defendant and Cortney were discussing "[w]hat was getting ready to happen," and the defendant asked Brown if she would tell the victim that she would have sex with him in an effort to get him to drive over quickly so the defendant could rob him. Brown agreed because she had been using drugs all day and was not "thinking."

Brown said that the defendant called the victim and that she told the victim she would go along with him and the defendant. When the victim arrived, Brown, Cortney Perry, and the defendant went outside and got into the victim's vehicle. The victim was driving, Perry was in the passenger's seat, Brown was seated behind Perry, and the defendant was seated behind the victim. They went to a gas station to get a cigar to fill with marijuana, then drove to an undeveloped area to smoke the marijuana. While they smoked, the victim started talking about his .380 handgun and pulled it out of the glovebox to show the defendant.

Brown recalled that the defendant asked to see the victim's gun and, after denying that he owned a gun, pulled out his gun and shot the victim. The defendant got out and opened the driver's door, causing the victim to fall out on the ground. The defendant then got in the driver's seat and drove to the Club on the Green Apartments where Saulsberry and Morris were waiting. Brown got

-4-

into Morris' van, while the men donned gloves and searched the victim's truck. Brown saw the defendant take off his clothes that were covered in blood, and everyone got into Morris' van.

Brown testified that the defendant directed Morris to drive back to the victim's body. The defendant tried to shoot the victim, but his gun jammed so he told Perry to shoot the victim with another gun. They drove back to the Loft Apartments, and she went inside and told Corey what had happened. The defendant, Perry, Saulsberry, and Morris left again, but returned later with Saulsberry screaming that he had been burned. Brown admitted that she pled guilty to facilitation of an aggravated robbery for her involvement.

Cortney Perry testified that at the time of the murder, he was living with the defendant at the Loft Apartments along with his brother, Ilyas Morris, Mieko Saulsberry, and Terrance Scott. On April 9, 2001, Perry was asleep when the defendant woke him saying that they needed rent money and that he had a plan to rob and kill the victim. According to Perry, the defendant was going to call the victim and offer to get him a hotel room so he could have sex with Takisha Brown, and then the defendant "was going to do him in." The defendant received a phone call from the victim and then told Perry that he was "just kidding" about doing anything to the victim. The defendant told Perry that he and the victim were going to smoke marijuana and have sex with Brown. Perry decided to go along to see if Brown was going to cheat on his brother, Corey.

Perry testified that he, the defendant, the victim, and Brown drove around looking for an open gas station so they could purchase a cigar to use to smoke marijuana. The defendant directed the victim to drive to a cove near Shepherds Tree and Kilarney, and the defendant and the victim started talking about guns. The victim reached under the radio and retrieved his gun to show the defendant, and the defendant asked to see it. The victim obliged, and the defendant began unloading and loading the bullets. Perry noted that he had started to fall asleep when he heard a gunshot and instinctively jumped out of the car. He heard a second shot as he ducked down near the rear of the vehicle. At that point, the defendant got out of the vehicle, pulled the victim out, and got in the driver's seat. Brown moved into the passenger's seat, and Perry started to walk off but ended up getting back in the vehicle.

Perry recalled that the defendant drove them to Club on the Green Apartments where they met Morris and Saulsberry. The defendant told him and Brown to get into Morris' van, and the defendant proceeded to take off his clothes. Morris got out of his van, took something out of the victim's truck, got back in the van, and they started to drive toward the Loft Apartments. On the way, the defendant directed Morris back to the victim's location and, while waving his "big chrome gun," told Perry that Perry was going to shoot the victim to make sure he was dead. After telling the defendant he was not going to do it, Perry got out of the van and shot the victim with the victim's gun that the defendant handed him. Then, they drove to a gas station to purchase fuel to burn the victim's truck, returned to the truck, and set it on fire. Saulsberry was burned in the process.

Perry testified that he and the defendant were questioned by the police a few days after the murder, but they were not arrested. Sometime after talking to the police, Perry, the defendant, and

Morris went to the defendant's mother's house where the defendant grabbed a bag containing the guns from the back of the house. Perry stated that the defendant "implied" that he wanted to throw the guns into Coro Lake, so they went to the lake and threw them in. Perry testified that he was arrested approximately a week later and told the police everything. He admitted that he was currently serving a life sentence as a result of his involvement in the murder. Perry recalled that the defendant's gun was a Lorcin and that the defendant and Brown had been in a relationship but that was before he knew the defendant.

Dr. O.C. Smith, Shelby County Medical Examiner at the time of the incident, testified that he performed the autopsy on the victim. Dr. Smith noted that the victim sustained two contact gunshot wounds to the head, which damaged the brain, and three gunshot wounds to the body. It was Dr. Smith's opinion that the gunshot wounds to the body occurred post-mortem. With regard to the gunshot wounds to the head, Dr. Smith stated that both wounds "went from up to down, went from right to left and went from back to front slightly." He recovered projectiles from both head wounds.

Officer Vennes Owens with the Memphis Police Department testified that she assisted with the homicide investigation in this case. Officer Owens recalled that Ilyas Morris led the officers to Coro Lake where two pistols were recovered. Morris also led the officers to the Loft Apartments where a plastic jug that had been used to transport gasoline was discarded.

Officer Reginald Morgan with the Memphis Police Department testified that he was the case officer in the investigation of the victim's murder. As part of his investigation, Officer Morgan went to Club on the Green Apartments where the victim's burned vehicle was found, and he also went to the morgue to retrieve the bullets that were recovered from the victim's body during autopsy. He transported those bullets as well as the guns recovered from Coro Lake to the Tennessee Bureau of Investigation (TBI) Crime Lab in Nashville for comparison.

Cervinia Braswell, forensic scientist and firearms examiner with the TBI, testified that the guns sent to the TBI for testing in this case were a .380 Lorcin pistol with the safety missing and a smaller gun – a .380 Davis. Both guns were caked with mud and rust but were operable after being cleaned. The TBI also received five bullets recovered from the victim's body during autopsy, one of which was unable to be examined due to damage caused when it entered the body. Two of the bullets had the same class characteristics of the Lorcin gun as well as similar individual characteristics, but not enough to say with 100% certainty that the bullets were fired from that particular Lorcin gun. The other two bullets had the same class characteristics of the Davis gun as well as similar individual characteristics, again, but not enough to say with 100% certainty that the bullets were fired from that particular Davis gun.

**Defense Proof**

Lolita Kent stated that in April 2001 she was the manager of a gas station near Airways Boulevard and Holmes Road and was working the overnight shift on April 9, 2001. She recalled that a man purchased gas and put it in a jug of some type around 2:00 a.m. She described the man who

bought the gas as heavyset, weighing approximately 207 pounds, and having dreadlocks in his hair. She did not recognize the man who bought the gas as anyone in the courtroom. She said that the man drove a lime green truck with tinted windows and rims. Kent explained that she paid attention to the truck because she had seen it before at the gas station, but the man who paid for the gas was not the usual driver of that truck.

Shalando Madkins stated that the defendant and Takisha Brown "fooled around with each other" for about a month in 2000 or 2001. She recalled that the defendant and Brown argued often and said that one time "probably [in] the summer of 2000," Brown attacked the defendant with a knife.

Mark Williams, long-time friend of the defendant, testified that the defendant is left-handed. Williams stated that he also knew Mieko Saulsberry and did not consider him to have a good reputation for truthfulness in the community.

After the conclusion of the proof, the jury found the defendant guilty of felony murder, premeditated murder, and especially aggravated robbery. The felony murder conviction was merged into the premeditated murder conviction, and the jury sentenced him to life imprisonment. The defendant was sentenced to twenty years for the especially aggravated robbery conviction, to be served consecutively to the life sentence. The defendant appealed.

## ANALYSIS

The defendant argues that the evidence was insufficient to support his convictions because (1) the court erred in not declaring Ilyas Morris and Mieko Saulsberry accomplices as a matter of law, and (2) even if Morris and Saulsberry were not accomplices as a matter of law, their testimony was insufficient to corroborate the testimony of the defendant's accomplices, Takisha Brown and Cortney Perry.

The defendant filed a pretrial motion asking the court to find that Cortney Perry, Takisha Brown, and Ilyas Morris were accomplices as a matter of law. During discussion concerning the jury charge, the trial court determined that Cortney Perry and Takisha Brown were accomplices as a matter of law, but with regard to Ilyas Morris and Mieko Saulsberry, the court noted:

> [N]either one of them testified that they did anything prior to the robbery and killing having taken place. Even though Mr. Morris admitted on cross that he heard they were talking about a robbery, he did nothing until after the robbery and I think one of them was convicted of accessory after the fact. But I didn't hear anything in the proof from their statements or any admissions or anything where they were in on it prior to the killing.

Defense counsel then restated his position that he believed Morris was an accomplice as a matter of law and asked the court to charge the jury as such, which the court denied. The court charged the

jury that, as accomplices as a matter of law, Cortney Perry's and Takisha Brown's testimony had to be sufficiently corroborated in order to convict the defendant, but that it was to make the determination of whether Ilyas Morris or Mieko Saulsberry were accomplices.

An accomplice is defined as one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. Lawson, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice, and, if so, whether there is corroborating evidence to support the witness's testimony. Id.; see Green, 915 S.W.2d at 831-32.

First addressing whether Morris should have been considered an accomplice as a matter of law, we note that Morris testified on direct examination at trial that as he was trying to fall asleep, he overheard the defendant, Brown, and Perry discussing something but he could not remember what they were talking about. Later, he was awakened by Saulsberry who wanted him to drive him to Club on the Green Apartments to meet the defendant. Morris acknowledged that after the defendant arrived at Club on the Green, Morris took a VCR out of the vehicle the defendant was driving – the victim's green Blazer. He conceded that he drove the defendant, Brown, Perry, and Saulsberry around to look for a jack, purchase gasoline, shoot the victim again, and burn the Blazer. Days later, he drove the defendant to dispose of the weapons.

On cross-examination, Morris admitted that when he was arrested he was told that he may be charged with murder in connection with the complaint. He also admitted that in his statement to the police he said that he had overheard the defendant, Brown, and Perry making plans to rob the victim, but he testified he did not think that the defendant was going to go through with it. When asked if he was the getaway driver, Morris said "[i]t's over with" by that time. On redirect, Morris testified that he drove where the defendant told him and that he was the only one in the group who had a vehicle.

In sum, the evidence is far from being clear and undisputed as to Morris' role in the crimes. There was no evidence that Morris knew a murder had been committed when he set out from the Club on the Green Apartments with the defendant and his cohorts. Although there is some indication Morris may have overheard the defendant's plan to rob the victim, he testified that he did not think the defendant was serious, and there was no evidence that Morris was in any way involved with coming up with the plan. As we have set out, an accomplice is one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." Griffis, 964 S.W.2d at 588. Moreover, Morris was

charged with and pled guilty to being an accessory after the fact. It has long been held that an accessory after the fact is not an accomplice to the charged offenses whose testimony must be corroborated. State v. Thomas, 158 S.W.3d 361, 402 (Tenn. 2005). We also note that Morris' testimony was essentially the same as in the defendant's first trial, and this court concluded on direct appeal from the defendant's first trial that whether Morris was an accomplice was a question properly left for the jury's determination. See Robinson, 239 S.W.3d at 226. Likewise, we conclude that the trial court properly determined that whether Morris was an accomplice was a question of fact for the jury and that he was not an accomplice as a matter of law.

With regard to Saulsberry, we note that it does not appear that the defendant argued for Saulsberry's status as an accomplice as a matter of law until the motion for new trial as his pretrial motion and argument during the jury charge discussion related only to Morris. In any event, it is not clear and undisputed that Saulsberry was an accomplice; therefore, the court did not err in leaving that determination to the jury. At trial, Saulsberry testified that he was asleep when the defendant woke him and said "we're going to ride" and to get in Morris' van. Saulsberry witnessed the purchasing of the gas, the defendant telling Perry to get out of the van and Perry shooting the victim, and assisted in burning the van. However, Saulsberry said that the defendant did not tell him what happened in the victim's truck and told him the less he knew the better. There was no evidence that Saulsberry had any knowledge of the impending robbery or murder, and his involvement was very minimal and after-the-fact. As such, we conclude that the trial court properly left the determination to the jury of whether Saulsberry was an accomplice.

Having determined that the trial court did not err in declining to charge the jury that Morris and Saulsberry were accomplices as a matter of law, we turn now to the second part of the defendant's argument that the testimonies of Morris and Saulsberry were insufficient to corroborate the testimony of the defendant's accomplices.

When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice

to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A premeditated and intentional killing of another is first degree murder. Tenn. Code Ann. § 39-13-202(a) (2006). Premeditation means that the intent to kill must have been formed prior to the act itself; a premeditated act is one done after the exercise of reflection and judgment. Id. § 39-13-202(d). The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).

Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the defendant's shooting of the victim after he had turned to retreat or escape; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime before the crime is committed, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971).

First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. 39-13-401(a). Especially aggravated robbery is robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a).

In the light most favorable to the State, the evidence shows that the victim owned a green Blazer with expensive flashy rims. The defendant sought to rob the victim, and the defendant had Brown promise to have sex with the victim so the victim would meet the defendant and the defendant could rob him. The victim picked up the defendant, Perry, and Brown in his Blazer and proceeded, at the defendant's direction, to an isolated cove to smoke marijuana. The victim and the defendant engaged in a discussion about guns, during which the defendant obtained permission to hold the victim's handgun. The defendant then pulled out his own gun and shot the victim twice.

-10-

The defendant left the victim's body and drove the victim's Blazer to meet Morris and Saulsberry. The defendant, Brown, and Perry got into Morris' van, and the defendant directed Morris to return to the victim's body where he had Perry shoot the victim again. The defendant also directed Morris to drive to the defendant's apartment to look for a jack to remove the rims from the victim's Blazer and to purchase gas that was used in burning the Blazer. The guns were later disposed of in a nearby lake. This evidence was sufficient to support the defendant's convictions of premeditated murder, felony murder, and especially aggravated robbery.

The defendant specifically argues that Morris' and Saulsberry's testimony was insufficient to corroborate the incriminating testimony of his accomplices, Brown and Perry.

A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Furthermore, accomplices cannot corroborate each other. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

As evidence of corroboration, Seku Teamer's testimony shows that during the early morning hours on the day of his death, the victim was planning to meet the defendant to have sex with Brown. Presented in more detail above, Morris' testimony about meeting the defendant at Club on the Green Apartments, seeing blood in the driver's seat of the victim's Blazer, trying to remove the rims from the Blazer, the defendant's ordering Perry to shoot the victim again, and the burning of the Blazer corroborate the testimony of Brown and Perry. Moreover, on cross-examination, Morris indicated that he overheard the defendant's plan to rob the victim, which the jury could have used as further corroboration. Saulsberry's testimony concerning meeting the defendant, the defendant's ordering Perry out of the van and Perry's shooting the victim's body, and the burning of the Blazer offers even more corroboration. Of note, on direct appeal from the defendant's first trial, this court concluded that Morris' testimony, which again was essentially the same as in the second trial, was

-11-

sufficient corroboration of Brown's and Perry's testimony. <u>Robinson</u>, 239 S.W.3d at 230. The jury in this trial was presented with the additional corroborating evidence from Saulsberry who did not testify in the first trial. Even though no non-accomplice was able to testify to the actual events of the murder, there was sufficient evidence that "fairly and legitimately" connected and implicated the defendant in the crimes.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect the correct offense date of April 10, 2001.

_____
ALAN E. GLENN, JUDGE